*Lawrence Ervin Montague v. State of Maryland*, No. 2033, September Term 2017
Opinion by Kehoe, J.


**EVIDENCE — RELEVANCY AND ITS LIMITS — RELATIONSHIP BETWEEN RULES**
The rule on character evidence and other special relevancy rules (for habits, subsequent remedial measures, compromise offers, payment of medical expenses, etc.) are just particularized applications of the balancing-test notion of Md. Rule 5-403.


**EVIDENCE — FACTORS AFFECTING ADMISSIBILITY — PREJUDICIAL EFFECT AND PROBATIVE VALUE OF RAP LYRICS**
Rap lyrics composed by a criminal defendant may be relevant and, as statements against interest or statements by a party opponent, may overcome the hurdle to the admission of hearsay. But if the lyrics are insufficiently tethered to the charged crime, their probative value is lowered and overcome by the danger of unfair prejudice that they present to the defendant composer. Md. Rules 5-403, 5-404.


**EVIDENCE — FACTORS AFFECTING ADMISSIBILITY — PREJUDICIAL EFFECT AND PROBATIVE VALUE OF RAP LYRICS**
When lyrics contain only general references glorifying violence, their minimal probative value is far outweighed by their unfair prejudicial impact as evidence of the defendant's bad character or propensity for violence in general. Md. Rules 5-403, 5-404.


**EVIDENCE — FACTORS AFFECTING ADMISSIBILITY — PREJUDICIAL EFFECT AND PROBATIVE VALUE OF RAP LYRICS**
When the prosecution can demonstrate a strong nexus between specific details of the composition and the circumstances of the offense, the probative value of defendant-composed rap lyrics increases. The lyrics do not simply suggest a bad character or a propensity to engage in the criminal conduct charged. Rather, they operate as direct proof of the defendant's criminal conduct—an admission or a confession that tends to prove the defendant's wrongdoing. Md. Rules 5-403, 5-404.


**EVIDENCE — FACTORS AFFECTING ADMISSIBILITY — PREJUDICIAL EFFECT AND PROBATIVE VALUE OF RAP LYRICS**
A strong temporal nexus may also boost the probative value of rap lyrics. Lyrics composed after the crime was committed may be stronger evidence of intent, motive or participation in the crime than lyrics composed years earlier. Md. Rules 5-403, 5-404.

Circuit Court for Anne Arundel County
Case No. 02-CR-17-000378

REPORTED

IN THE COURT OF SPECIAL APPEALS

OF MARYLAND

No. 2033

September Term, 2017

_____

LAWRENCE ERVIN MONTAGUE

v.

STATE OF MARYLAND

_____

Fader, C.J.,
Kehoe,
Reed,

JJ.

_____

Opinion by Kehoe, J.

_____

Filed: December 23, 2019

Pursuant to Maryland Uniform Electronic Legal
Materials Act
(§§ 10-1601 et seq. of the State Government Article) this document is authentic.



Suzanne C. Johnson, Clerk

After a jury trial in the Circuit Court for Anne Arundel County, Lawrence Ervin Montague was convicted of murder in the second degree and several related offenses. He raises four issues on appeal, which we have reworded and reordered:

1. Did the trial court err in admitting, as substantive evidence of Montague's guilt, rap lyrics performed by Montague on a phone call while he awaited trial?

2. Did the trial court err when it denied Montague's motion to suppress evidence of a pretrial photo identification on the grounds that it was the result of an impermissibly suggestive procedure and was thus unreliable?

3. Did the trial court err in giving the jury an instruction on flight and concealment?

4. Did the trial court err in limiting cross-examination of a critical witness about her potential bias?

Because our answer to each of these questions is no, we will affirm the convictions.

## Background

Montague does not challenge the legal sufficiency of the evidence against him. We will summarize the evidence produced at trial to give context to the parties' appellate contentions. *See Washington v. State*, 180 Md. App. 458, 461 n.2 (2008).

During the early morning hours of January 16, 2017, George Forrester was shot in the parking lot of the Woodside Gardens apartment complex in Annapolis. He was transported to a nearby hospital, where he died a short time later.

Tracy Tasker, Mr. Forrester's cousin, witnessed the shooting. According to her testimony, Tasker and Mr. Forrester had driven to Woodside Gardens in his pickup truck that night to purchase cocaine from Montague. Before the purchase, Tasker had given Mr. Forrester a counterfeit $100 bill to pay for the cocaine. Mr. Forrester purchased the cocaine

from Montague while Tasker waited in her cousin's pickup truck. It was the State's theory that Montague almost immediately realized that the $100 bill was counterfeit and so he followed Mr. Forrester out into the parking lot and shot him as he was walking towards his truck. According to the State, Montague then fled from the scene.

Two days after the shooting, Tasker identified Montague as Mr. Forrester's assailant from a photo array prepared by the police. At the same time, she told the police that she recognized Montague as the shooter because she had purchased drugs from him in the past. About two weeks later, Montague was arrested by the police at a motel near Annapolis.

After his arrest, Montague made several telephone calls from the county detention facility. During a call recorded on October 7, 2017, Montague made a number of statements in the form of a self-composed rap. To buttress its case at trial, the State introduced into evidence a recording of Montague's recitation of the rap lyrics. These lyrics are the focus of part 1 of our analysis.

In addition to Tasker's testimony, the testimony of another witness placed Montague at the Woodside Garden apartment complex the night of the shooting. Tajah Brown, the mother of Montague's child, testified that one of Montague's sisters lived at Woodside Gardens and that she and Montague had been staying in her apartment on the night of the shooting. Brown also testified that Montague left the apartment at 11:00 p.m. on January 15, 2017, just hours before Mr. Forrester was killed. Brown was also with Montague when he was arrested. We discuss this part of her testimony in part 3 of our analysis.

The State presented other evidence as well. There was medical evidence as to the cause of death. A firearms expert testified that shell casings found near the site of the shooting were fired from a .40-caliber handgun. There was a limited amount of DNA evidence that was inconclusive. Finally, the State played a video recording from Woodside Gardens' security system that showed a man in dark clothing running from the scene of the shooting. Although the runner's face was not clear in the video, Tasker told the jury that the man who ran was the shooter and that the shooter was Montague.

Montague did not present any evidence. The jury returned verdicts of guilty as to murder in the second degree, assault in the first degree, use of a firearm in a crime of violence, use of a firearm in the commission of a felony, and wearing, carrying, or transporting a handgun on or about the person. The court sentenced Montague to a thirty-year term of imprisonment for second-degree murder with a consecutive twenty-year sentence for use of a firearm in a crime of violence. The court merged the remaining convictions for sentencing purposes with the murder and handgun convictions.

**Analysis**

1. The rap lyrics

In its case in chief, the State introduced into evidence a recording of a telephone call between Montague and a friend, made while Montague was in pretrial detention. During this call, Montague recited a rap lyric of his own composition, which included the following (emphasis added):

Y.S.K. / I always let it spray / *And, if a n---a' ever play /*
*Treat his head like a target / You know he's dead today /*
Do his ass like a Navy Seal /
My n----s we ain't never squeal, /
I'll pop your top like an orange peel /
You know I'm from the streets / F.T.G. / you know the gutter is me /
Cause I'll be always repping my Y.S.K. shit, / Cause I'm the King / I'll be playin' the block bitch/
*And if you ever play with me/ I'll give you a dream a couple shots snitch* /
It's like hockey pucks the way I dish out this/
There's a *.40 when this bitch goin' hit up shit*/ 4 or 5 rip up your body quick/
*Like a pickup truck /But you ain't getting picked up/*
*You getting picked up by the ambulance* / You could be dead on the spot / I'll be on your ass.

After the voice on the other end of the line warned Montague about reciting the verses, Montague replied, "I'm gucci. It's a rap. F--k they can do for—about a rap?"

Montague contends that the trial court erred in admitting the recording of these rap lyrics for two reasons. First, relying upon Md. Rule 5-402,[1] he asserts that the lyrics were inadmissible on relevancy grounds, because they were so "ambiguous and equivocal" that they provided the jury nothing more than fodder for speculation. Second, Montague argues that admission of the rap lyrics violated Md. Rule 5-403, which provides that even relevant evidence may be excluded "if its probative value is substantially outweighed by the danger of unfair prejudice." He relies primarily upon *Hannah v. State*, 420 Md. 339, 343–44, 348 (2011), for this proposition.

---

[1] Md. Rule 5-402 states that "[e]xcept as otherwise provided by constitutions, statutes, or these rules, or by decisional law not inconsistent with these rules, all relevant evidence is admissible. Evidence that is not relevant is not admissible."

In response, the State argues that Montague's recorded statement was properly admitted because it was made after the murder and can reasonably be interpreted as containing specific references to the shooting. Finally, the State also contends that that the probative value of the lyrics was not substantially outweighed by any unfair prejudice.

We agree with the State. The trial court did not err when it admitted Montague's rap lyrics into evidence. This was a relevant statement of a party opponent, whose probative value was not substantially outweighed by any unfair prejudice caused by its admission.

A.

Before addressing the merits of the parties' contentions, we will provide some background information. Evidence is relevant when it has "any tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence." Md. Rule 5-401. Whether evidence is relevant is a legal issue reviewed by appellate courts *de novo*. *Schisler v. State*, 394 Md. 519, 535 (2006).

Relevancy is not the be-all and end-all of admissibility, however. Relevant evidence must be "worth what it costs." 1 *McCormick on Evid*. § 185 (7th ed. 2016). Trial courts should exclude even relevant evidence "if its probative value is substantially outweighed by the danger of unfair prejudice." Md. Rule 5-403. Evidence is unfairly prejudicial "when it tends to have some adverse effect beyond tending to prove the fact or issue that justified its admission." *Hannah v. State*, 420 Md. 339, 347 (2011) (cleaned up). In deciding

whether a piece of evidence is "unfairly prejudicial" under the rules of evidence, this Court weighs "the inflammatory character of the evidence against the utility the evidence will provide to the jurors' evaluation of the issues in the case." *Smith v. State*, 218 Md. App. 689, 705 (2014). When evidence is of "a highly incendiary nature," its admissibility hinges on whether it "greatly aid[s] the jury's understanding of why the defendant was the person who committed the particular crime charged." *Id.* (quoting *Gutierrez v. State*, 423 Md. 476, 495 (2011)). Importantly, although general relevancy issues are reviewed *de novo*, deciding whether the unfairly prejudicial impact of a particular item of evidence substantially outweighs its probative value falls within the trial court's discretion. *Smith*, 218 Md. App. at 704.

Maryland has but one reported appellate decision addressing the relevancy of rap lyrics and the unfair prejudice that may result from their admission: *Hannah v. State,* 420 Md. 339 (2011). This case is the cornerstone of Montague's contentions, and we will discuss *Hannah* later in our analysis. But because *Hannah* involves the admission of rap lyrics for impeachment purposes—not as substantive evidence of a defendant's guilt, introduced in the prosecution's case in chief—we think it useful to first survey some of the decisions from other jurisdictions to distill the principles that guided the *Hannah* Court and that will shape our analysis here.[2]

---

[2] For a comprehensive collection of relevant cases, see Jason B. Binimow, Annotation, *Admissibility of Rap Lyrics or Videos in Criminal Prosecutions*, 43 A.L.R.7th Art. 1 (2019).

One of the leading cases on the admissibility of rap lyrics is *State v. Skinner,* 95 A.3d 236 (N.J. 2014). Skinner was charged with attempted murder and related crimes. A police search after his arrest uncovered notebooks full of "profane and violent" rap lyrics authored by Skinner. *Id.* at 240. A rap-music label had recorded of some of Skinner's lyrics in the past, and the prosecution conceded that some of the lyrics admitted into evidence had been written "long before" the commission of the crimes in question. *Id.* at 240. At a pretrial hearing, Skinner objected to the admission of these lyrics, arguing their admission would violate New Jersey Rule of Evidence 404(b). *Id.* This rule, like Md. Rule 5-404(b),[3] renders inadmissible "evidence of other crimes, wrongs, or acts" if used "to prove the disposition of a person in order to show that such person acted in conformity therewith." N.J. R. Evid. 404(b). Such bad-acts evidence could be introduced, however, for non-propensity purposes, like when it is used "as proof of motive, opportunity, intent, preparation, plan, knowledge, identity or absence of mistake or accident." N.J. R. Evid. 404(b).

The trial court overruled Skinner's objection because, it said, the lyrics provided insight into Skinner's motive and intent in committing the crimes charged. *Skinner*, 95

---

[3] The language of Md. Rule 5-404(b) largely mirrors that of its New Jersey counterpart and of Fed. R. Evid. 404. The Maryland rule states in relevant part:

> Evidence of other crimes, wrongs, or other acts . . . is not admissible to prove the character of a person in order to show action in the conformity therewith. Such evidence, however, may be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, common scheme or plan, knowledge, identity, absence of mistake or accident, or in conformity with Rule 5-413.

A.3d at 240–41. A police officer then read to the jury extensive excerpts (totaling thirteen pages of transcript testimony) of the lyrics, material which the Court characterized as "replete with expletives and included graphic depictions of violence, bloodshed, death, maiming, and dismemberment." *Id.* at 241.

On appeal from Skinner's conviction, the Supreme Court of New Jersey concluded that admitting the rap lyrics had been an error. *Id.* at 253. The court's holding was that the admission of the evidence violated N.J. R. Evid. 404(b) because the "graphically violent" lyrics were fairly viewed as evidence that Skinner had "a propensity toward committing, or at the very least glorifying, violence and death." *Id.* at 251. But the court's reasoning relied on the "probative value" and "unfair prejudice" balancing language of N.J. R. Evid. 403.[4] The court explained that prejudicial effect of reading the lyrics "overwhelm[ed]" their *de minimis* probative value. *Id.* Skinner's "fictional expressive writings" did not "exhibit[]" an unmistakable factual connection to the charged crimes." *Id.* at 252. There was an "utter absence" of evidence that Skinner had engaged in any of the conduct portrayed in his rap

---

[4] This is consistent with how we understand the relationship between Md. Rule 5-403 and other relevancy rules, like Md. Rule 5-404. The rule on character evidence and other special relevancy rules (for habits, subsequent remedial measures, compromise offers, payment of medical expenses, etc.) are just "particularized applications of the balancing test notion of Rule 403." Norman M. Garland, *An Overview of Relevance and Hearsay*, 22 Sw. U. L. Rev. 1039, 1047 (1993); *see also* 5 Lynn McLain, *Maryland Evidence State and Federal* §403:1 (3d ed. 2013) ("Md. Rule 5-403 is, at bottom, a general summary of the considerations that went into formulating the more specific rules of exclusion . . . ."); 1 *McCormick on Evid.* § 185 (7th ed. 2016) ("In certain areas, such as proof of character, comparable situations recur so often that relatively particularized rules channel the exercise of discretion.").

lyrics. *Id.* at 251. The court also noted that Skinner's lyrics had been written "long before the time of [the victim's] shooting," making them far less probative of any motive Skinner would have had the evening the victim was shot and almost killed. *Id.* at 251.

Simply put, "absent a strong nexus between specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced," *id.* at 251–52, Skinner's lyrics amounted to little more than bad-acts evidence used for forbidden propensity purposes. Without a "strong connection" to the attempted murder with which Skinner had been charged, the admission of his rap lyrics "risked unduly prejudicing the jury without much, if any, probative value." *Id.* at 253. The *Skinner* court did note, however, that "rap lyric evidence that provides *direct proof* against a defendant—such as an admission or details that are not generally known and dovetail with the facts of the case" could be admissible, subject to general relevancy rules and Rule 403 balancing. *Id.* at 249 n.5 (emphasis added). Such lyrics, it said, would not be considered character evidence used for forbidden propensity purposes under N.J. R. Evid. 404. *Id.*

The Supreme Court of South Carolina reached a similar result in *State v. Cheeseboro*, 552 S.E.2d 300 (S.C. 2001). At Cheeseboro's trial for, among other charges, armed robbery, kidnapping and murder, the trial court allowed the prosecution to introduce into evidence these defendant-composed lyrics: "I . . . put [your] blood on the dance floor," "I spray fire in the sky," and "Fools leave clues, I leave a blood pool." *Id.* at 312. On appeal, the South Carolina court concluded the admission of the lyrics violated South Carolina's analogue to Md. Rule 5-403 (emphasis added):

The trial judge admitted these lyrics as an admission against interest under Rule 801(d)(2), based on the song's reference to leaving no prints and bodies left in a pool of blood. We find these references too vague in context to support the admission of this evidence. *The minimal probative value of this document is far outweighed by its unfair prejudicial impact as evidence of appellant's bad character, i.e. his propensity for violence in general. . . .* [T]hese lyrics contain only *general references glorifying violence.* Accordingly, the . . . song should have been excluded. See [S.C. R. Evid. 403] (although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice).

*Id.* at 313.

Under different facts, however, other courts have approved the admission of a defendant's rap lyrics as substantive evidence of his guilt. In *Greene v. Commonwealth*, 197 S.W.3d 76 (Ky. 2006), the defendant was charged with murdering his wife. At trial, the prosecution introduced a video of a rap, made after the murder, in which Greene boasted of killing his wife and described details of the crime. *Id.* at 86. Greene argued that the admission of the video violated Kentucky Rules of Evidence 403 and 404(b). *Id.* But the Supreme Court of Kentucky disagreed:

Evidence of criminal conduct other than that being tried is admissible only if probative of an issue independent of character or criminal predisposition, and only if its probative value on that issue outweighs the unfair prejudice with respect to character.

\* \* \*

Greene contends that the rap video is simply character evidence introduced to prove a "criminal disposition." Greene, however, misapplies the character evidence standard. Evidence of prior arrests, convictions, or bad acts is excluded not because they are not relevant, but rather because the probative value of the character evidence is substantially outweighed by the prejudicial effect. Here, that is not the case because (a) the video refers to Greene's actions and emotions regarding this crime, not a previous offense, (b) the video sheds light on Greene's . . . mental state shortly after the killing, and (c) the video establishes premeditation and motive in Greene's own

words. For the foregoing reasons, we affirm the trial court's admission of the rap video montage.

197 S.W.3d at 87 (cleaned up).

The Supreme Court of Nevada similarly affirmed the admission of rap lyrics in *Holmes v. State*, 306 P.3d 415 (Nev. 2013). In that case, Holmes had been charged with robbery and murder. The evidence showed that the perpetrators wore masks, turned out the victim's pockets, and tore a necklace from the victim's throat. *Id.* at 417. At Holmes's trial, the prosecution introduced lyrics from a rap song Holmes had written while in a California jail, awaiting extradition to Nevada. *Id.* at 418. Those lyrics described a robbery in which all three of the above listed events occurred. *Id.* The trial court admitted the lyrics because, it determined, a jury "could reasonably view the lyrics as factual, not fictional." *Id.* These "factual" lyrics—a statement by a party opponent, excepted from the general bar on hearsay evidence—"tended to prove [Holmes's] involvement in the charged robbery." *Id.* The trial court acknowledged that "admitting gangsta rap carries the risk of it being misunderstood or misused as criminal propensity or 'bad act' evidence." *Id*. But it determined the probative value of the lyrics was not substantially outweighed by the danger of unfair prejudice. *Id*. The Nevada Court explained:

> We recognize, as did the district court, that defendant-authored rap lyrics may employ metaphor, exaggeration, and other artistic devices, and can involve "abstract representations of events or ubiquitous storylines." But *these features do not exempt such writings from jury consideration where, as here, the lyrics describe details that mirror the crime charged.* It is one thing to exclude defendant-authored fictional accounts, be they rap lyrics or some other form of artistic expression, when offered to show a propensity for

- 11 -

> violence. . . . It is quite another *when the defendant-authored writing incorporates details of the crime charged.*

*Id.* at 419 (cleaned up and emphasis added).[5]

Although the facts and the outcomes of these decisions differ, there is a convergence in the analyses of the various courts. The appellate courts recognize that there is a real danger of unfair prejudice by the introduction of rap lyrics that have been composed by a criminal defendant. *See*, *e.g.*, *Skinner*, 95 A.3d at 238 ("The admission of [a] defendant's inflammatory rap verses, a genre that certain members of society view as art and other view as distasteful and descriptive of a mean-spirited culture, risk[s] poisoning the jury against defendant."). Such lyrics may be relevant—otherwise, analyzing their admissibility using Rule 5-403 balancing would be a meaningless exercise. *See* Md. Rule 5-402 ("Evidence that is not relevant is not admissible."). And as statements against interest or statements by a party opponent, they may overcome the hurdle to the admission of hearsay. But if the lyrics to be introduced are "insufficiently tethered to the charged crime," *Skinner*, 95 A.3d at 253, their probative value is lowered and overcome by the danger of unfair prejudice that they present to the defendant composer. When they contain "only general references

---

[5] Other courts have concluded that rap-lyric evidence was admissible based upon similar facts. *See United States v. Recio*, 884 F.3d 230, 235 (4th Cir. 2018); *United States v. Moore*, 639 F.3d 443, 447–48 (8th Cir. 2011); *United States v. Belfast*, 611 F.3d 783, 819–20 (11th Cir. 2010); *United States v. Foster*, 939 F.2d 445, 456 (7th Cir. 1991); *Cook v. State*, 45 S.W.3d 820, 822–23 (Ark. 2001); *Taylor v. State*, 76 A.3d 791, 802 (Del. 2013); *Tann v. United States*, 127 A.3d 400, 468–69 (D.C. 2015); *Taylor v. State*, 772 S.E.2d 630, 633–34 (Ga. 2015); *Bryant v. State,* 802 N.E.2d 486, 489 (Ind. App. 2004); *People v. Hayes*, 168 A. D. 3d 489, 91 N.Y.S. 3d (N.Y. App. Div. 2019).

glorifying violence," the lyrics' "minimal probative value . . . is far outweighed by [their] unfair prejudicial impact as evidence of [the defendant's] bad character, *i.e.* his propensity for violence in general." *Cheeseboro*, 552 S.E.2d at 313.

On the other hand, when the prosecution can demonstrate "a strong nexus between specific details of the artistic composition and the circumstances of the offense for which the evidence is being adduced," *Skinner*, 95 A.3d at 251–52, the probative value of defendant-composed rap lyrics increases. The lyrics do not simply suggest a bad character—a propensity to engage in the criminal conduct charged. Rather, they operate as "direct proof" of the defendant's criminal conduct. *Id.* at 249 n.5. When the lyrics "describe details that mirror the crime charged," a jury can "reasonably view the lyrics as factual, not fictional," and treat them as any other admission or confession that tends to prove the defendant's wrongdoing. *Holmes*, 306 P.3d at 418; *see also Skinner*, 95 A.3d at 249 n.5 ("A jury need not be shielded from a defendant's *confession* simply because it is conveyed in a rap or other artistic setting." (emphasis added)). A strong temporal nexus may also boost the probative value of the lyrics. Rap lyrics composed after the crimes in question were committed may be stronger evidence of intent, motive or participation in the crime than lyrics composed years earlier. *Compare*, *e.g.*, *Greene*, 197 S.W.3d at 86–87, *with Skinner*, 95 A.3d at 503, 520.

This analytical framework is consistent with the Court's analysis in *Hannah*, 420 Md. 339, Maryland's only reported case on the admissibility of rap lyrics. As we noted above, the admissibility determination in *Hannah* was made in a different trial context. The

- 13 -

defendant had been charged with, and convicted of, the attempted murder of his ex-girlfriend's new boyfriend. 420 Md. at 340. Hannah took the stand in his defense and on direct examination testified that he had never owned, held, or fired a handgun, that he had no interest in guns, and that he would not know how to go about acquiring one. *Id.* at 342–43. To impeach Hannah, and not to provide substantive evidence of his guilt, the prosecutor cross-examined Hannah about violent lyrics he'd written in a notebook about two years before the shooting occurred *Id.* at 345–46.[6] The trial court permitted this line of questioning over defense counsel's objection. *Id.* at 344.

The question before the Court of Appeals was whether the trial court had abused its discretion by permitting a cross-examination that was "harassing, unfairly prejudicial, confusing or unduly repetitive." *Id.* at 347 (citing *Marshall v.* State, 346 Md. 186, 193 (1997)). After reviewing many of the cases we have explored in our analysis, the Court held that allowing the prosecutor to question Hannah about his lyrics was an abuse of discretion. Unlike the lyrics ruled admissible in some of the other cases above, Hannah's lyrics were not "admissible autobiographical statements of historical fact," but rather

---

[6] The lyrics included: "One, two three, shot ya ass just got drop"; "I ain't got guns, got a duz unda da seat"; "Ya see da tinted cum down n out come da glock"; "Ya just got jacked, we leave da scene in da lime green"; "So you betta step ta me before I blow you off ya feet"; "Bring da whole click, we put em permanently sleep"; "Wa you think, I ain't got burners, got a duz unda da seat"; "Ya talk a bunch shit n ya sure. . . . So pull your f----- trigga [n----] go pop, pop, one, two three shot ya ass jus got drop"; "I'll put you in a funeral." 420 Md. at 345–46 (emphasis omitted). The prosecutor confronted the defendant with each of these lyrics, one at a time, in an extended back and forth intended to contradict Hannah's claimed ignorance about and disinterest in guns.

"inadmissible works of fiction." *Id.* at 348. Hannah had thus been "unfairly prejudiced" by the cross-examination about these lyrics, because they "were probative of no issue other than the issue of whether he has a propensity for violence." *Id.* at 355. Because the lyrics had no strong connection to the facts of the case before the court, their value as impeachment evidence was not worth the costs they exacted as bad-character evidence.

B.

Applying the principles outlined above, we conclude there was a strong nexus between the content of Montague's rap and the circumstances of Mr. Forrester's murder. In his rap, Montague indicated that, if cheated ("played"), he would exact immediate retribution ("if a n---a' ever play / Treat his head like a target / You know he's dead today"). Mr. Forrester "played" Montague by handing him a fake $100 bill in exchange for drugs, and shortly thereafter he was shot to death. Montague's rap referred to .40-caliber bullets. Forensics investigators found .40-caliber shell casings at the scene of the shooting. The rap contained references to a pickup truck. Forrester arrived at the Woodside Gardens apartment complex in a pickup. Finally, Montague said that those who "played" him would be "picked up by the ambulance." That is exactly what happed to Mr. Forrester. Just as in *Holmes,* "the lyrics describe details that mirror the crime charged." 129 Nev. at 572.

The timing of the composition also supports an inference that Montague's rap described actual events. Mr. Forrester was murdered on January 16, 2017. Montague recited his rap on October 7, 2017, while he was incarcerated and awaiting trial for Mr.

- 15 -

Forrester's murder. The rap was not composed months or years before the shooting occurred, as in *Skinner* and *Hannah*, but rather after the crime took place, as in *Greene* and *Holmes*.

The lyrics admitted here alluded to details of the crime and explained Montague's possible motive for the murder. They tended to make it more probable that Montague was Mr. Forrester's killer. Therefore, the trial court did not err in concluding that the rap lyrics were relevant. Nor can we conclude that the trial court abused its discretion in concluding that the probative value of the lyrics was not substantially outweighed by any unfair prejudice. This is because, despite their "incendiary nature," the rap lyrics were strong evidence as to "why the defendant was the person who committed the particular crime charged." *Smith*, 218 Md. App. at 705. Because of their patent factual connection to the charged murder, these lyrics were far more than evidence of a bad character. Instead, they were properly viewed by the trial court as direct proof of Montague's criminal wrongdoing, whose probative value was not substantially outweighed by any danger of unfair prejudice that their admission would entail.

## 2. The pretrial photo identification

Montague contends that the trial court erred when it denied his motion to suppress evidence of the pretrial photo identification in which Tasker identified him as the shooter. First, he argues that the photo array was impermissibly suggestive. In support of this contention, Montague notes that the shooter had been described as wearing black clothing

and that he was the only person wearing black clothing in the array shown to Tasker. He also notes that the police changed the photo array after another eyewitness to the shooting had been unable to identify the shooter. In the first array, two of the men depicted in the photo were wearing black shirts, but in the second array—the array shown to Tasker—only Montague was wearing a black shirt.

Second, Montague argues that the State cannot show that Tasker's identification—the result of an allegedly impermissibly suggestive process—was nonetheless reliable. He asserts that Tasker "could only manage vague descriptions of the shooter after viewing him from afar during a frightening and stressful experience." He also argues that Tasker's perception was impaired because she had ingested cocaine earlier in the day.

In response, the State asserts that the array was not impermissibly suggestive and that, in any event, Tasker's identification of Montague was independently reliable.

We agree with the State that Tasker's identification did not result from an impermissibly suggestive procedure. Accordingly, any concerns over the reliability of her would affect only the weight to be given to the identification by a jury and not its admissibility.

### A.

We will first describe the circumstances surrounding Tasker's identification of Montague as the shooter. The evidence presented at the suppression hearing consisted of the testimony of two witnesses, both City of Annapolis detectives, as well as an audio–

video recording of the interview in which Tasker identified Montague as the person who shot and killed Mr. Forrester.

Detective John Murphy was the lead detective on the investigation of Mr. Forrester's murder. Murphy first described the way that photo arrays are prepared by the Annapolis Police Department. Arrays consist of six booking photographs taken within the last ten years. Murphy related that, with the assistance of a department computer program, called "In-Pursuit," officers can identify photos for possible use in an array by specifying certain defined search parameters (e.g., race, skin tone, height and weight) in a database search. Clothing color is not among the program's search parameters. The In-Pursuit program typically identifies booking photographs of "anywhere from 50 to 1,000 persons" in response to a query. The officer then selects six photographs for the array.

Murphy related that he identified Montague as a suspect within twenty-four hours of the shooting. The police also identified two possible eyewitnesses, Tasker and DeShawn Caton. For that reason, he prepared two arrays. Each array included Montague's most recent booking photograph as well as five other photographs selected by Murphy from the results of his In-Pursuit database search. He showed the first array to Caton. This array featured two men (including Montague) wearing black shirts, three wearing white shirts, and one wearing a gray shirt. Caton was unable to identify the shooter.

Murphy prepared a second array to show to Tasker. Preparing an alternate array, Murphy testified, was standard procedure when there are multiple eyewitnesses:

> [W]hen I show[] multiple witnesses arrays, I change pictures in the array so that they're not seeing -- the witnesses, even though . . . we tell them not to discuss the case or say they picked out anybody, I, in addition to reading that, I also protect myself by changing the lineup up so they're not seeing the same person in multiple lineups.

Like the first array, the array prepared for Tasker consisted of six booking photographs. However, this array contained only one photo—Montague's—in which the subject was wearing a black shirt T-shirt and a black hooded jacket. Murphy explained that he did not select that photograph because the shooter had been described as wearing black clothing but rather because Montague "just happened to be wearing" black in his most recent booking photograph.

The second witness at the suppression hearing was Annapolis Police Department detective Charles Bealefeld, who interviewed Tasker and showed her the photo array. Bealefeld testified that he was not the composer of the photo array. That responsibility belonged to Murphy.

On January 18, 2017, Tasker was arrested on an outstanding warrant related to a theft charge and was brought to the police station. Bealefeld, who the only detective in the office when Tasker was brought into the station, knew that she was a potential witness to the homicide and called Murphy, then off-duty. Murphy told Bealefeld that there was a folder on his desk that contained an array of photographs, including one of Montague. At Murphy's request, Bealefeld conducted the array.[7]

---

[7] An FBI agent was also present at the array but took no part in it.

Bealefeld testified that, before the photo-identification interview began, Tasker asked him if he could "help [Tasker] out with [her] case." Bealefeld testified that he purposely did not answer her question. He testified that he never told Tasker whom to choose and did not point to any specific person or clothing in the photographic lineup. He also did not make any promises or inducements to Tasker. He further explained that he did not show the photographs to Tasker before she entered the interview room.

During the suppression hearing, the trial court admitted into evidence an audio–video recording of Tasker's interview. In the interview, Tasker told Bealefeld that she was sitting in the passenger seat of Forrester's pickup truck when he was shot and that she saw the man who was doing the shooting. Tasker further related that, although she did not know the shooter's name, he was a drug dealer who "sells crack all day every day" in Woodside Gardens and that she had seen him "all the time" at the apartment complex. She stated that she had purchased drugs from him in hand-to-hand transactions on two occasions prior to the shooting. In response to a question from Bealefeld, Tasker stated that she knew "exactly what he looks like."

The video recording shows that, after this discussion took place, Bealefeld handed Tasker six photographs, each in a separate envelope. Tasker opened the first four envelopes and rejected each of them in quick succession. She then opened the fifth envelope (which contained Montague's photograph) and declared "That's him. That's him right there."

At the end of the suppression hearing, the circuit court denied Montague's motion to suppress Tasker's identification by photo array and her anticipated in-court identification:

THE COURT: [W]hen the police set up a photo array, I thought I heard, or least it was implied that clothing is not part of the composition. In other words, if you're contending that all six people should not only have the same hair length, same facial hair, same complexion and also be wearing the same clothes, I don't know that that's a standard of any photo array. So I think that the procedure itself was fine and I would have a huge problem, however, if that same array was shown to the same witness . . . . Had [an array] been shown to Ms. Tasker and she didn't pick anybody and then [the police] came back later with a photo array with only person in a black shirt and altered just one photo, I'd have a huge problem with that.

## B.

The general standard of review of a decision to grant or deny a motion to suppress evidence in a criminal case is well-established:

> Appellate review of a motion to suppress is limited to the record developed at the suppression hearing. We view the evidence and inferences that may be drawn therefrom in the light most favorable to the party who prevails on the motion, here, the State. We accept the suppression court's factual findings unless they are shown to be clearly erroneous. We give due weight to a trial court's finding that the officer was credible. We review legal questions *de novo*, and where, as here, a party has raised a constitutional challenge . . . , we must make an independent constitutional evaluation by reviewing the relevant law and applying it to the unique facts and circumstances of the case.

*State v. Johnson*, 458 Md. 519, 532–33 (2018) (cleaned up).

Analyzing a defendant's challenge to an out-of-court identification entails two steps. *Jones v. State*, 395 Md. 97, 110 (2006). First, the defendant must prove the procedures used by police to get the identification were "impermissibly suggestive." *Morales v. State*, 219 Md. App. 1, 13 (2014). Photo-arrays are suggestive "when the manner itself of presenting the array to the witness or the makeup of the array indicates which photograph the witness should identify." *Smiley v. State*, 442 Md. 168, 180 (2015). "Concerns may arise when one

- 21 -

individual's photograph is shown to a witness multiple times or somehow stands out from the other photos in the array." *Small v. State*, 464 Md. 68, 89 (2019) (citing *Simmons v. United States*, 390 U.S. 377, 383–94 (1968)). However, although the people in the array should resemble one another, *Small*, 464 Md. at 89 (citing *Webster v. State*, 299 Md. 581, 620 (1984)), a fair photo array "need not be composed of clones," *Smiley*, 442 Md. at 181.

"If the court determines that the extrajudicial identification procedure was not suggestive, then the inquiry ends and evidence of the procedure is admissible at trial." *Small*, 464 Md. at 83. If, however, the court concludes that the identification process was impermissibly suggestive, then the State must prove by clear and convincing evidence that the identification was nonetheless reliable. *Id.* at 84. The State meets this burden when it shows that "the independent reliability in the identification outweighs the corrupting effect of the suggestive procedure." *Wood v. State,* 196 Md. App. 146, 161 (2010) (quoting *Gatewood v. State*, 158 Md. App. 458, 475 (2004)). In this exercise, courts focus on five factors: "the witness's opportunity to view the criminal at the time of the crime, the witness's degree of attention, the accuracy of the witness's description of the criminal, the witness's level of certainty in his or her identification, and the length of time between the crime and the identification." *Small*, 464 Md. at 84 (citing *Neil v. Biggers*, 409 U.S. 188, 199–200 (1972); *Jones v. State,* 310 Md. 569, 577–78 (1989)).

## C.

Applying these standards as part of our independent review of the evidence presented at the suppression hearing, we conclude Montague has not met his burden of showing that the photo-array procedure used by the police in this case was impermissibly suggestive.

Montague contends that the array shown to Tasker was impermissibly suggestive because he was the only person in it wearing black clothing. The suppression court correctly rejected this argument. During the hearing, Montague's trial counsel acknowledged all the men in the array shown to Tasker were of the same race, with generally the same hairstyles, similar in weight, and with visible tattoos. We have reviewed the photographs in the array and agree with trial counsel's characterization of them. Montague also acknowledges that Detective Bealefeld did not take any step to direct Tasker's attention to his photograph, and, in any event, the record is clear that he did not. Instead, Montague's argument is that the array was unfairly suggestive because the shooter was identified as wearing black clothing and he was the only person in the array wearing a black shirt. This is not enough to render the array impermissibly suggestive. To be sure, a lineup in which only the suspect is wearing *distinctive* clothing worn by the perpetrator can be problematic. *See, e.g.*, *United States v. Hickman*, 151 F.3d 446, 459–60 (5th Cir. 1998) (defendant in photo array was only person wearing a "Starter" jacket, after witness had told police that one of the robbers was wearing such a jacket). But black clothing is hardly distinctive. Defense counsel said as much during the suppression hearing: "[W]e can say black is a pretty innocuous color and it's just sort of general clothing[.]"

Additionally, Murphy testified that the In-Pursuit program did not include clothing color as a search variable and that he used the photograph of Montague because it was his most recent booking photo. Finally, before Bealefeld showed Tasker any of the photos, he established that she had purchased drugs from the shooter on two separate occasions, both hand-to-hand transactions, and that she knew "exactly what he looks like."

In sum, Montague has failed to demonstrate that the photo array itself, or the way it was conducted, "indicate[d] which photograph the witness should identify." *Smiley*, 442 Md. at 180.[8] Because we conclude that the array shown to Tasker was not impermissibly suggestive, we need not address whether Tasker's identification was nonetheless reliable. *See Wood v. State,* 196 Md. App. 146, 161 (2010) ("Reliability . . . does not even become an issue for a suppression hearing until impermissible suggestiveness has been shown. The

---

[8] In his brief, Montague directs our attention to a number of cases in which courts have held that line-ups or photo arrays were impermissibly suggestive: *Foster v. California*, 394 U.S. 440, 441–41(1969); *United States v. Wade*, 388 U.S. 218, 233 (1967); *United States v. Hickman*, 151 F.3d 446, 459 (5th Cir. 1998), *rehearing in banc granted*, 165 F. 3d 1020 (1999), *convictions affirmed in part and vacated in part*, 179 F.3d 230 (1999) (per curiam); *United States ex rel. Pierce v. Cannon*, 508 F.2d 197, 199 (7th Cir. 1974); *Israel v. Odom*, 521 F.2d 1370, 1374 (7th Cir. 1975); and *United States v. Williams*, 469 F.2d 540, 547 (D.C. Cir. 1972).

The relevant teaching from these cases is that "[l]ineups in which suspects are the only participants wearing distinctive clothing or otherwise matching important elements of the description provided by the victim have been severely criticized as substantially increasing the dangers of misidentification." *Israel*, 521 F.2d at 1374. As we have explained in the main text, that is not what occurred in Montague's case.

quality of the lifeboat does not become an issue until the torpedo of impermissible suggestiveness hits the ship.").

### 3. The flight and concealment instructions

At the close of evidence at trial, the State requested that the court give the jury a pattern instruction on flight or concealment by the defendant.[9] Defense counsel objected:

> DEFENSE COUNSEL: . . . I don't believe that [a flight or concealment issue] has been generated. There were some earlier questions with the first witness about being, you know, in a hotel room, but all the evidence from her was we weren't hiding. We weren't on the run, or actually in regards to just my client, wasn't hiding, wasn't on the run. We were there. The police came. There's no running. There's no flight. There's no concealment. He's arrested and taken to the police station.

> THE COURT: Wasn't there evidence—I'm not—way before the hotel, wasn't there evidence that the shooter ran in behind Building 708?

> DEFENSE COUNSEL: Well, the mere fact, Your Honor, that someone leaves an actual scene I don't think lends itself to—

> THE COURT: That's exactly what that instruction says.

> DEFENSE COUNSEL: Your Honor, I believe . . . that this deals more with after the fact once an investigation has begun. Once they have figured out that or a defendant has figured out that he's wanted, then there is flight, then there is concealment. The mere fact that someone shoots and doesn't stick around for the police to come does not generate that instruction.

---

[9] This instruction, MPJI-Cr 3:24 (Flight or Concealment of Defendant), reads:

> A person's flight [concealment] immediately after the commission of a crime, or after being accused of committing a crime, is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt. Flight [concealment] under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must first decide whether there is evidence of flight [concealment]. If you decide there is evidence of flight [concealment], you then must decide whether this flight [concealment] shows a consciousness of guilt.

THE COURT: It says—are you reading this? It says a person's flight immediately after the commission of a crime. Did you read that? It's in the first sentence.

DEFENSE COUNSEL: I'm reading it, Your Honor, but I still made my objection.

The trial court overruled the objection and, shortly thereafter, instructed the jury as

follows:

A person's flight or concealment immediately after the commission of a crime or after being accused of committing a crime is not enough by itself to establish guilt, but it is a fact that may be considered by you as evidence of guilt.

Flight or concealment under these circumstances may be motivated by a variety of factors, some of which are fully consistent with innocence. You must decide first whether there is evidence of flight. If you decide there is evidence of flight, you then must decide whether this flight shows a consciousness of guilt.

The burden is on the State to prove beyond a reasonable doubt that the offense was committed and that the Defendant was the person who committed it.[10]

After the instructions were completed, the following occurred:

THE COURT: Gentlemen, I think that concludes the instructions. Defense satisfied?

DEFENSE COUNSEL: Yes, Your Honor.

THE COURT: The State?

PROSECUTOR: Yes, Your Honor.

THE COURT: Okay. All right, next step, folks, would be closing argument. . . .

---

[10] The final sentence in this excerpt is not part of MPJI-Cr 3:24.

On appeal, Montague presents three reasons why the trial court erred when it instructed the jury on flight and concealment. First, citing *People v. London*, 254 Cal. Rptr. 59 (Cal. Ct. App. 1988), and *Commonwealth v. Groce*, 517 N.E.2d 1297 (Mass. App. Ct. 1988), Montague contends that where identity is the only issue in a case, evidence of flight is irrelevant, making any such instruction improper. He points out that the fact that someone's flight from the crime scene of a crime may be evidence of guilt cannot be relevant unless the person fleeing was the defendant. However, he argues, by giving a flight instruction, the court implicitly conveyed to the jury that the judge believed that it was the defendant who fled and, thus, that the victim's identification testimony was accurate. Second, Montague contends that "permitting a flight instruction where the identity of the attacker is the only issue at trial" is inconsistent with the analysis by the Court of Appeals in *Thompson v. State*, 393 Md. 291 (2006). Further, he argues, the effect of the error was magnified by the lack of any evidence that Montague attempted to flee from the motel when he was arrested. Third, Montague asserts that there was no evidentiary basis to support the court's instruction on concealment.

In response, the State argues that Montague's contentions are not preserved for review and that, even if we find the issue was preserved for our review, the trial court did not err in instructing the jury on flight and concealment because the instruction was generated by the evidence. We will first address the State's preservation contentions.

The State's preservation argument is hydra-headed. First, it argues that Montague's appellate contentions as to the flight instruction are not preserved for appellate review

- 27 -

because counsel failed to object to the instruction after the court finished its instructions. Second, it argues that defense counsel affirmatively waived his contentions by indicating his satisfaction with the court's instructions after they were given. Third, the State suggests that the grounds presented to the trial court as to why the flight instruction shouldn't have been given are different from his appellate arguments and thus are not properly before us.

Md. Rule 4-325(e) states that "[n]o party may assign as error the giving or the failure to give an instruction unless the party objects on the record promptly *after* the court instructs the jury, *stating distinctly the matter to which the party objects and the grounds of the objection*" (emphasis added). Our case law makes clear that the Maryland Rules are not aspirational guidelines. Rather, they are "precise rubrics established to promote the orderly and efficient administration of justice and . . . are to be read and followed." *Dorsey v. State*, 349 Md. 688, 700–01 (1998). The requirement that an objection to an instruction be made *after* the court has completed its instructions is important, for an objection at that point gives the trial court "an opportunity to correct the instruction in light of a well-founded objection." *Stabb v. State*, 423 Md. 454, 464–65 (2011). Consistent with these principles, a party's failure to object to an instruction after the court has instructed the jury generally forfeits the right to raise the issue on appeal. *See, e.g.*, *Correll v. State*, 215 Md. App. 483, 516 (2013).

However, the rule that parties must object to instructions after they are given is not an absolute requirement. As Judge Greene has recently noted for the Court of Appeals, in the context of jury instructions, "there is 'some play in the joints' in determining whether an

issue has been preserved. If the record reflects that the trial court understands the objection and, upon understanding the objection, rejects it, this Court will deem the issue preserved for appellate review." *Watts v. State*, 457 Md. 419, 428 (2018) (quoting *Sergeant Co. v. Pickett*, 283 Md. 284, 289 (1978)). For an appellate court to conclude that there has been substantial compliance with Rule 4-325(e), the following conditions must be met:

> There must be an objection to the instruction; the objection must appear on the record; the objection must be accompanied by a definite statement of the ground for objection unless the ground for objection is apparent from the record[,] and *the circumstances must be such that a renewal of the objection after the court instructs the jury would be futile or useless*.

*Bowman v. State*, 337 Md. 65, 69 (1994) (emphasis added). However, substantial compliance with the objection requirement will preserve only those contentions actually raised before the trial court in the first instance. *Watts*, 457 Md. at 428 (citing *Smullen v. State*, 380 Md. 233, 276 (2004)).

Based on the foregoing, we conclude that two of Montague's appellate contentions are clearly not preserved for appellate review. To the trial court, Montague's counsel argued that the flight instruction was inappropriate because "[t]he mere fact that someone shoots and doesn't stick around for the police to come does not generate that instruction." This is a very far cry from Montague's first appellate argument, which is that, by giving the flight instruction, the trial court implicitly endorsed the State's position that Montague was the shooter. It is equally distant from his second contention, which is that a court is

categorically prohibited from giving a flight instruction when the identity of the culprit is at issue.[11]

Montague's third argument—that there was no evidentiary basis for the court to instruct the jury on concealment—presents a more difficult preservation problem. The objection was certainly made to the trial court before the jury was instructed. The basis for this objection was made clear to the court at that time, and it is equally clear that the trial court did not agree with the premise of trial counsel's argument. However, there is nothing in the trial record that suggests that renewing the objection would have been "futile or useless." *Compare Gore v. State*, 309 Md. 203, 206, 209 (1987) (holding that, after the trial court stated to defense counsel "you can object all you want, but I'm going to [give the

---

[11] In support of his latter contention, Montague relies on *Thompson v. State*, 393 Md. 291, 303 (2006) for the proposition that "[t]he flight instruction in this case was improper because the identity of the shooter was the central issue in this case." Montague reads *Thompson* too broadly.

In *Thompson*, the Court held that the flight instruction was inappropriate unless the following four inferences could reasonably be drawn from the facts presented to the jury:

> that the behavior of the defendant suggests flight; that the flight suggests a consciousness of guilt; that the consciousness of guilt is related to the crime charged or a closely related crime; and that the consciousness of guilt of the crime charged suggests actual guilt of the crime charged or a closely related crime.

393 Md. at 312 (citing *United States v. Myers*, 550 F.2d 1036 (5th Cir.1977)). Montague argues that the evidence against him failed to provide a basis by which the jury could conclude that he was the person who fled from the scene of the shooting. This argument fails in the present case because Tasker testified that Montague shot her cousin and that he then fled from the scene.

controverted instruction],” no additional objection was required to comply with Rule 4-325(e)), *and Corbin v. State*, 94 Md. App. 21, 27 n.2 (1992) (after being rebuffed by the trial court on three separate occasions, counsel did not have to renew her objection after the jury was instructed because doing so would have been an exercise in futility), *with Sims v. State*, 319 Md. 540, 548–49 (1990) (stating that its substantial-compliance decisions “represent the rare exceptions [to Rule 4-325(e)] and the requirements of the Rule should be followed closely,” and that “[u]nless the attorney preserves the point by proper objection after the charge, or has somehow made it crystal clear that there is an ongoing objection to the failure of the court to give the requested instruction, the objection may be lost”). We therefore conclude that Montague’s appellate contention that there was an insufficient evidentiary basis for the flight and concealment instruction is not preserved for appellate review.[12, 13]

---

[12] Because we conclude that Montague’s argument is not preserved for appellate review, we need not consider the State’s contention that that defense counsel affirmatively waived his client’s right to assert that the instruction was erroneous by responding in the affirmative when the trial court asked counsel whether they were “satisfied” with the jury instructions.

[13] Even if Montague’s appellate contention as to the concealment instruction were preserved, we would not find it to be persuasive. When reviewing a trial court’s decision to grant or deny a requested instruction, we consider “(1) whether the requested instruction was a correct statement of the law; (2) whether it was applicable under the facts of the case; and (3) whether it was fairly covered in the instructions actually given.” *Stabb v. State*, 423 Md. 454, 465 (2011). Montague does not assert that the concealment instruction incorrectly stated the law or that it was covered by other instructions. He contends that the instruction was not applicable under the facts of the case.

4. The cross-examination of Tasker

Montague's final appellate contention is that the trial court erred in restricting his cross-examination of Tasker. He points out that, when she initially came to the police

---

An instruction is justified when the party seeking it "produce[s] 'some evidence' that supports the requested instruction." *Bazzle v. State*, 426 Md. 541, 551 (2012). The some-evidence standard is not an exacting one and calls for "no more than what it says—'some,' as that word is understood in common, everyday usage." *Arthur v. State*, 420 Md. 512, 525 (2011). The evidence presented "need not rise to the level of 'beyond reasonable doubt' or 'clear and convincing' or preponderance," and "[t]he source of the evidence is immaterial." *Id.*

In this case, the requisite evidentiary threshold was satisfied by the testimony of Tajah Brown, the mother of Montague's child, who testified during the State's case. Brown was a reluctant witness, and her testimony was not entirely consistent. Eventually the court permitted the prosecutor to play a portion of an audio–video recording of Brown's interview by a detective after Montague's arrest. From the combination of her testimony and her statement played to the jury, Brown related that she and Montague were staying in an apartment at Woodside Gardens leased by one of Montague's sisters, on the night of the murder. Montague left that apartment at about 11 p.m. that night and did not return. Brown did not see him for several days but spoke to him by telephone. She was with Montague a couple of weeks later, however, when he was arrested by the police at a motel near Annapolis. During the portion the interview played at trial, Brown indicated that during the time between the murder and his arrest, Montague would not tell his mother or his sisters where he was, and that he told Brown that he was "not turning [his] f-----g self in right now." Brown told the police that she asked Montague, "If you didn't do anything, why run?" However, Brown also told police that she went to the motel because he wanted to see her before he turned himself in.

Because it was entitled to credit "all, part, or none" of this evidence, *Omayaka v. Omayaka*, 417 Md. 643, 659 (2011), the jury could have inferred that Montague knew that the police were searching for him in connection with the Forrester murder, that he refused to disclose his whereabouts to his mother or his sisters because they might be contacted by the police regarding his whereabouts, and that he refused to contact the police even though Brown urged him to do so. In our view, this is some evidence of concealment, and thus the instruction on concealment was justified in this case.

station for the photo identification, she asked Detective Bealefeld if he could "help [Tasker] out with [her] case." Tasker was referring to several theft charges then pending against her. During his cross-examination of Tasker at trial, defense counsel sought to impeach Tasker for bias, suggesting that she received beneficial treatment in exchange for her testimony:

> DEFENSE COUNSEL: [Y]ou were facing, with all six [charges], close to 70 years . . . and you received a sentence of nine months.
>
> PROSECUTOR: Objection, Your Honor.
>
> TASKER: God is good.
>
> DEFENSE COUNSEL: Is that correct?
>
> TASKER: Yes.
>
> THE COURT: What's the objection?
>
> PROSECUTOR: May we approach?
>
> * * *
>
> (At 11:35:10 a.m., Counsel approached the bench and the following occurred:)
>
> PROSECUTOR: First of all, the penalty is way beyond what an impeachment is. You can ask about prior convictions, that's it. You can't get into sentencing or the facts of the case, you can't do any of that. . . .
>
> THE COURT: Well, I'm assuming you're talking about her exposure on all [of] these cases.
>
> DEFENSE COUNSEL: That's all, Your Honor.
>
> * * *
>
> THE COURT: Well, I think it's fair if she got any deals or anything in return for (indiscernible).
>
> PROSECUTOR: Well, that should be—
>
> THE COURT: (Indiscernible) the maximum penalty for all the charges is extremely misleading, so I'm going to sustain.
>
> * * *

DEFENSE COUNSEL: Okay. My point in asking it is, is to show that she's received beneficial treatment, and my point and argument will be that she received beneficial treatment because of the (indiscernible).

THE COURT: Counsel . . . . unless you can convince me you know the case, if she got special treatment, then I'm going to stick by my ruling.

Counsel did not respond, and the trial court then sustained the prosecution's objection and instructed the jury to disregard defense counsel's last question and Tasker's response. Defense counsel proceeded to question Tasker about specific prior convictions for theft without objection from the prosecutor or interference from the court.

To this Court, Montague contends that by foreclosing cross-examination about the potential sentences that Tasker's pending charges carried and instructing the jury to disregard that fact, "the court precluded . . . Montague from reaching his constitutionally required threshold level of inquiry." According to Montague, the fact that Tasker received a sentence of only nine months—out of an asserted potential maximum of seventy years—after asking police whether her testimony would help with her case "was important to the jury's determination of Tasker's reliability and potential bias."

Md. Rule 5-616(a)(4) permits witnesses to be impeached by proof that "a witness is biased, prejudiced, interested in the outcome of the proceeding, or has a motive to testify falsely." The rule is a reflection of one aspect of the guarantee, embodied in both the Sixth Amendment and Article 21 of the Maryland Declaration of Rights, that a criminal defendant may confront the witnesses against him. *See, e.g.*, *Davis v. Alaska*, 415 U.S. 308, 316 (1974); *Simmons v. State*, 333 Md. 547, 555–56 (1994). For the right to confrontation to be meaningful, a defendant must be permitted to cross-examine his or her accusers in

order to demonstrate bias. *See Martinez v. State*, 416 Md. 418, 428 (2010) (defense counsel must be "permitted to expose to the jury the facts from which jurors could appropriately draw inferences relating to the reliability of the witness" (cleaned up)).

However, trial courts have "wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant." *Smallwood v. State*, 320 Md. 300, 307 (1990) (quoting *Delaware v. Van Arsdall*, 475 U.S. 673, 679 (1986)). As long as the trial court provides a defendant in a criminal case the "threshold of inquiry" required by the Confrontation Clause, the court's limitation on cross-examination will be reversed only for an abuse of discretion. *Peterson v. State*, 444 Md. 105, 123–24 (2015).

Montague asserts that by failing to permit his defense counsel to cross-examine Tasker about the sentence her charges carried and by instructing the jury to disregard her potential seventy-year sentence compared to her received nine-month sentence, the circuit court precluded Montague from reaching his constitutionally required threshold level of inquiry. We do not agree.

Defense counsel cross-examined Tasker extensively about her prior criminal convictions for theft, as well as her previous addiction problems with heroin and cocaine. After the State's objection, the trial court indicated to defense counsel that questions about the maximum sentences that faced Tasker would be appropriate if she had received a plea bargain for reduced sentences in return for her testimony. The court specifically invited

defense counsel to "convince" the court that Tasker "got special treatment." Had counsel made such a proffer, the proper course would have been for the court to hold a proceeding outside of the presence of the jury to permit the parties to address whether the probative value of the evidence outweighed the danger of unfair prejudice. *See, e.g.*, *Jackson v. State*, 340 Md. 705, 717–18 (1995); *Washington v. State*, 191 Md. App. 48, 76 (2010). However, defense counsel made no attempt to do so. We hold that the trial court afforded Montague the requisite latitude in presenting evidence to the jury as to why is should not credit Tasker's testimony. Under the circumstances, the trial court did not impinge upon Montague's rights under the Confrontation Clause.

Because Montague's confrontation rights were not violated, we would reverse the trial court's ruling only if we concluded that the court's decision amounted to an abuse of discretion. This means that, to warrant reversal, the court's decision to limit the cross-examination of Tasker would have to be "clearly against the logic and effect of facts and inferences before the court," "clearly untenable, unfairly depriving a litigant of a substantial right and denying a just result," or "an untenable judicial act that defies reason and works an injustice." *Alexis v. State*, 437 Md. 457, 478 (2014) (quoting *North v. North*, 102 Md. App. 1, 13–14 (1994)).

There was no untenable judicial act here. Insofar as defense counsel's inquiry was intended to suggest that Tasker's testimony was motivated by some special treatment that she had received from the State, the trial court gave defense counsel an opportunity to proffer a factual basis for this claim, in order to make her sentencing disparity relevant. *See*

- 36 -

Md. Rule 5-104(b) ("When the relevance of evidence depends upon the fulfillment of a condition of fact, the court shall admit it upon, or subject to, the introduction of evidence sufficient to support a finding by the trier of fact that the condition has been fulfilled."). Defense counsel did not make such a proffer, which foreclosed this avenue of impeachment. Insofar as defense counsel's inquiry was intended to suggest Tasker was an untrustworthy witness because she had been convicted of various theft crimes, defense counsel received all the latitude permitted for an impeachment by prior conviction. *See In re Gary T.*, 222 Md. App. 374, 381 (2015) ("The only information allowed [for prior-conviction impeachment] are the name and date of the conviction and the sentence imposed." (citing *State v. Giddens*, 335 Md. 205, 222 (1994)). Defense counsel's question—asking Tasker about the aggregate maximum sentences that she faced as well as the sentence that she actually received—was clearly improper, and the court did not err in sustaining the prosecutor's objection and instructing the jury to disregard the question and Tasker's response.

**THE JUDGMENTS OF THE CIRCUIT COURT FOR ANNE ARUNDEL COUNTY ARE AFFIRMED. APPELLANT TO PAY COSTS.**